

FILED

JAN 1 4 2025

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY ___ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMIE SWANSON,<br><br>        Plaintiff,<br><br>v.<br><br>DIONISIO FLORES,<br><br>        Defendant. | Case No.: 3:23-cv-02021-BEN-DEB<br><br>**ORDER**<br><br>**[ECF No. 15]** |

## ORDER DENYING DEFENDANT'S MOTION TO DISMISS

Plaintiff, Jamie Swanson, initiates this action against Defendant Dionisio Flores, asserting a single claim under the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb, *et seq*. ("RFRA"). Defendant moves to dismiss the claim pursuant to Fed. R. Civ. Proc. 12(b)(6) asserting Plaintiff fails to state a claim upon which relief may be granted or, alternatively, that he is entitled to qualified immunity. The motion to dismiss is denied.

### I.   BACKGROUND

Plaintiff claims she was a civilian employee with the United States Marine Corps during all relevant periods. According to her, after finishing her active-duty service, she started working in 2005 as a Supervisory Human Resources Assistant (Military) in the Legal Section of Camp Pendleton's Headquarters and Support Battalion. Plaintiff also states that Defendant served as her supervisor. Throughout her employment, she alleges

1

that she maintained her genuine religious beliefs, which she shares by conversing with others with similar faith-based views.

According to the Complaint, in 2016, a new employee was hired, working in the same building, and seated around twenty feet from Plaintiff's desk. Plaintiff asserts that her faith-based discussions with coworkers who shared her beliefs were offensive to Defendant, who was also her direct supervisor. Shortly after, Defendant directed Plaintiff to cease all religious discussions in the office.

In September 2018, Defendant issued a second directive requiring Plaintiff to remove a Bible and a religious calendar from her desk. Plaintiff claims that these directives—(1) prohibiting discussions about religion and (2) mandating the removal of religious items from her desk—substantially burdened her ability to practice her sincerely held religious beliefs. Additionally, she asserts that these actions did not advance any compelling government interest, nor were the least restrictive means to safeguard such interest.

Plaintiff alleges Defendant's directives infringed upon her rights under RFRA, obstructing her freedom to practice her religion. Notably, Defendant neither asserts that her desk was accessible to the public nor claims to have a compelling government interest that would warrant limitations on Plaintiff's religious expression.

## II.   **LEGAL STANDARD**

### A. Rule 12(b)(6) Standard

Under Federal Rule of Civil Procedure 12(b)(6), a court can dismiss a complaint if the plaintiff's allegations do not present a plausible set of facts that, if true, would warrant relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (holding that a claim must be facially plausible to survive a motion to dismiss). The pleadings must raise the right to relief beyond the speculative level; a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted).

**B. Rule 8 Requirements**

At the same time, Rule 8(a)(2) requires no more than "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed, R. Civ. P. 8(a)(2). Additionally, Rule 8(d)(1) specifies that "[e]ach allegation must be simple, concise, and direct." A court should not dismiss a complaint that meets these standards unless it fails to articulate a plausible claim.

## III.    REQUEST FOR JUDICIAL NOTICE RE: MOTION TO DISMISS

### A. General Rule

Plaintiff and Defendant ask the Court to take judicial notice of new documents. Generally, courts evaluating a Rule 12(b)(6) motion do not consider material outside the complaint; instead, they typically limit their review to the complaint's contents. *Van Buskirk v. Cable News Network, Inc.,* 284 F.3d 977, 980 (9th Cir. 2002). When the court considers matters outside the Complaint, it converts a motion to dismiss into a summary judgment motion per Rule 12(d).

### B. Exceptions

This rule has two exceptions: (1) judicial notice under Federal Rule of Evidence 201 and (2) the incorporation-by-reference doctrine.[1] Neither applies here.

### C. The Court Denies Both Requests

Therefore, this Court denies both Plaintiff and Defendant's requests to take

---

[1]    Each mechanism permits district courts to consider materials outside the complaint on a Rule 12(b)(6) motion. Rule 201 permits a court to take judicial notice of an adjudicative fact if it is "not subject to reasonable dispute." Fed. R. Evid. 201(b). On the other hand, "incorporation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself. The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002-03 (9th Cir. 2018). A court may incorporate a document by reference if the complaint refers extensively to the document or the document forms the basis for the plaintiff's claim. *Id.* (citations omitted). Here, the Court declines to incorporate documents by reference.

3

judicial notice.

III.   **DISCUSSION**

### 1. Defendant's Claim of Qualified Immunity

Defendant does not claim that Plaintiff has failed to state a valid claim for relief. Instead, Defendant argues that he is entitled to the judicially recognized defense of qualified immunity. *See Harlow v. Fitzgerald*, 457 U.S. 800 (1982) (recognizing a qualified immunity defense for high White House officials). Qualified immunity protects government officials in applicable cases. For a plaintiff to successfully challenge a claim of qualified immunity, they must demonstrate at summary judgment or trial: (1) a valid claim that a legal right was violated and (2) that this right was clearly established. *Id.* at 808 ("damages suits concerning constitutional violations need not proceed to trial, but can be terminated on a properly supported motion for summary judgment based on the defense of immunity."). Here, Defendant asserts that qualified immunity is available to him as a defense and that Plaintiff can show neither element.

### 2. RFRA Claims and Defenses

The statutory defense to an RFRA claim is the existence of a compelling government interest pursued through the least restrictive means. The Supreme Court and the Ninth Circuit have yet to determine if an implied qualified immunity defense exists for officials sued under RFRA. This Court determines that qualified immunity is inapplicable to an RFRA claim, as discussed *infra*.

The Supreme Court describes RFRA as "prohibit[ing] the Federal Government from imposing substantial burdens on religious exercise, absent a compelling interest pursued through the least restrictive means." *Tanzin v. Tanvir*, 592 U.S. 43, 45 (2020). RFRA goes beyond existing §1983 and Title VII remedies. The Supreme Court says that RFRA aims to ensure "greater protection for religious exercise than is available under the First Amendment." *Ramirez v. Collier*, 595 U.S. 411, 424 (2022) (quoting *Holt v Hobbs*, 574 U.S. 352, 356-58 (2015)).

Plaintiff's Complaint asserts that Defendant's twin directives of no-religious speech and no-religious desktop items advanced no compelling government interest, thus substantially burdening her religious exercise. See Complaint, at ¶¶ 48-54. Under RFRA, the law "gives a person whose religious exercise has been unlawfully burdened the right to seek 'appropriate relief.'" *Tanzin*, 592 U.S. at 45. Here, Plaintiff adequately states an RFRA claim that satisfies Rule 8 and the plausibility standard. She asserts a violation of a Constitutional right doubly protected by federal statute. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993).

### 1. Individual Capacity Defendant

Plaintiff seeks money damages under RFRA from her former supervisor, who she sues in his personal capacity. A government employee sued individually is considered a valid party defendant. *Tanzin*, 592 U.S. at 47 ("We first have to determine if injured parties can sue Government officials in their personal capacities. RFRA's text provides a clear answer: They can.").

### 2. Money Damages

Additionally, an RFRA plaintiff may seek money damages.[2] *Id*. at 45 ("The question here is whether 'appropriate relief' includes money damages against Government officials in their individual capacities. We hold that it does."). Because Plaintiff no longer works under Defendant's supervision, an injunction cannot remedy her past injuries. Consequently, appropriate relief may include money damages.

### 3. Burden on Beliefs

Defendant argues under Rule 12(b)(6) that Plaintiff has not stated a plausible claim for relief because she has not sufficiently described a substantial burden on her free

---

[2] "A damages remedy is not just 'appropriate' relief as viewed through the lens of suits against Government employees. It is also the only form of relief that can remedy some RFRA violations. For certain injuries, such as respondents' wasted plane tickets, effective relief consists of damages, not an injunction." *Tanzin*, 592 U.S. at 51.

1   exercise.  For example, Defendant asserts that "if Plaintiff is not required to speak of her

2   faith *always*, in *all places*, and with *all persons* . . . then Mr. Flores' directive was at most

3   a *de minimis* or inconsequential restriction . . . ."  Def's Mot to Dismiss, Dkt. 15, at 14.

4   (emphasis in original).  The Supreme Court has said that the government is not entitled to

5   judge the quality of one's exercise of religion to merit constitutional protection.

6   "Religious beliefs need not be acceptable, logical, consistent, or comprehensible to others

7   in order to merit First Amendment protection." *Thomas v. Review Bd. of Indiana*

8   *Employment Security Div.*, 450 U.S. 707, 714 (1981).  "Repeatedly and in many different

9   contexts, we have warned that courts must not presume to determine the place of a

10  particular belief in a religion or the plausibility of a religious claim." *Emp. Div., Dep't of*

11  *Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 887 (1990) (citations omitted).  "It is not

12  within the judicial ken to question the centrality of particular beliefs or practices to a

13  faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v.*

14  *C.I.R.*, 490 U.S. 680, 699 (1989).  Plaintiff alleged in her Complaint that Defendant's two

15  directives substantially burdened her free exercise.  That is sufficient to state a claim for

16  relief.

17  **IV.**    **Qualified Immunity**

18  　　Defendant principally argues his claim of a qualified immunity defense.

19  Specifically, Defendant bases his defense on one key argument: he claims there was no

20  clarity on this constitutional right at the time of the alleged violation. *E.g., District of*

21  *Columbia v. Westby*, 583 U.S. 48, 62-63 (2018) ("Under our precedents, officers are

22  entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or

23  constitutional right, and (2) the unlawfulness of their conduct was "clearly established at

24  the time.").

25  　　The judiciary created qualified immunity. Two decades before Congress enacted

26  RFRA, the Supreme Court recognized that senior White House Aids in the Nixon

27  Administration could raise a qualified immunity defense. *Harlow,* 457 U.S. at 818-19.

28  Courts have recognized this judicially-created immunity in the judicially-created *Bivens*

1    (v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971)) claims and Civil War era

2    §1983 claims (both of which pre-date RFRA).  RFRA makes no mention of a qualified

3    immunity defense.  And the Supreme Court has not decided whether qualified immunity

4    is available as a defense.[3]  Congress establishes and governs statutory causes of action,

5    possessing the authority to create or abrogate defenses.  The only defense mentioned in

6    RFRA is the compelling government-interest defense.  See § 2000bb-1(b).  The United

7    States Court of Appeals for the Third Circuit has observed that in RFRA, "[t]here is no

8    mention of qualified immunity.  Rather, liability appears mandatory unless the defendant

9    can show that the actions constituting the substantial burden are the least restrictive

10   means of furthering a compelling government interest.  And the open-ended phrase

11   'appropriate relief' does not obviously hint at a qualified immunity defense." *Mack v.*

12   *Yost*, 63 F.4th 211, 222 (3d Cir. 2023).

13         The Ninth Circuit Court of Appeals has not yet decided whether a defendant may

14   assert qualified immunity as a defense under RFRA.  Instead, Defendant relies on *Fazaga*

15   *v. F.B.I.*, 965 F.3d 1015 (9th Cir. 2020), *rev'd on other grounds*, *Fed. Bureau of*

16   *Investigation v. Fazaga*, 595 U.S. 344 (2022).  *Fazaga* was an RFRA case where

17   government agents claimed qualified immunity defense.  The *Fazaga* opinion clarified

18   that it did not determine the availability of the defense; instead, it noted that the parties

19   failed to present a dispute.  *Id.* at n.42 ("The parties do not dispute that qualified

20   immunity is an available defense to a RFRA claim. We therefore assume it is.").

21         Defendant also points to *Lebron v. Rumsfeld*, 670 F.3d 540 (4th Cir. 2012).

22   *Lebron* raised doubts about the applicability of RFRA to individuals who are enemy

23   combatants in military detention.  *Id.* at 559-60 ("But we have no indication that

24   Congress even considered the prospect of RFRA actions brought by enemy combatants. .

25   . ."); *see also See Rasul v. Myers*, 563 F.3d 527, 535–36 (D.C. Cir. 2009), *cert. denied*,

26

27   _____

28   [3] In *Tanzin*, the question was not formally presented for decision.  Both parties assumed
     that qualified immunity might apply to a RFRA claim.  592 U.S. at 51 n.*.

23-CV-02021-BEN-DEB

1   558 U.S. 1091 (2009) (Brown, J., concurring) ("Accepting plaintiffs' argument that

2   RFRA imports the entire Free Exercise Clause edifice into the military detention context

3   would revolutionize the treatment of captured combatants in a way Congress did not

4   contemplate."). *Lebron* addressed RFRA in an unusual setting and shed little light on

5   RFRA in a typical office context.

6         Lastly, Defendant cites *Walden v. Centers for Disease Control & Prevention*, 669

7   F.3d 1277, 1290 (11th Cir. 2012), *abrogated on other grounds by EEOC v. Abercrombie*

8   *& Fitch Stores, Inc.*, 575 U.S. 768 (2015). It remains uncertain whether *Walden* believed

9   qualified immunity might serve as a defense; however, the court ultimately addressed the

10  RFRA claims on their merits. 669 F.3d at 1290.

11        If Congress had intended to include a qualified immunity or a good faith defense

12  for officials in RFRA, it did not say so. Congress enacted RFRA against a legal backdrop

13  that included a qualified immunity defense for federal officials subject to *Bivens* actions.

14  Congress can override the legal background of common-law adjudicatory principles --

15  like qualified immunity. *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 457 (2012)

16  ("Congress plainly can override those principles."). RFRA is an example of Congress

17  overriding judicial doctrines that did not afford sufficient protection for citizens' free

18  exercise of religion. Before RFRA, a federal *Bivens* defendant who substantially

19  burdened the free exercise rights of a citizen might escape liability through qualified

20  immunity. However, Congress aimed to expand the existing First Amendment

21  protections for the free exercise of religion by enacting RFRA. "RFRA operates as a

22  kind of super statute, displacing the normal operation of other federal laws. . . ." *Bostock*

23  *v. Clayton Cnty.*, 590 U.S. 644, 683 (2020). With no binding authority, this Court finds

24  that the only RFRA defense Congress intended is that stated in the statute, *i.e.,* the

25  defense that the government was acting to further a compelling interest and was doing so

26  by the least restrictive means. *See* § 2000bb-1(b). Because Defendant's motion relies on

27  the assertion of qualified immunity, which is not available under RFRA, the motion to

28  dismiss is denied on this grounds.

### 1. RFRA's Double Protection

RFRA provides double protection for the free exercise of religion and extends to the military branches of the United States government. "RFRA, in turn, sets the standards binding every department of the United States to recognize and accommodate sincerely held religious beliefs. It undoubtedly 'applies in the military context.'" *U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336, 346 (5th Cir. 2022), *partial stay granted sub-nom, Austin v. U.S. Navy Seals*, 142 S. Ct. 1301 (2022) (citations omitted). And the Supreme Court has "never held . . . that military personnel are barred from all redress in civilian courts for constitutional wrongs suffered in the course of military service." *Chappell v. Wallace*, 462 U. S. 296, 304 (1983) (citations omitted).

### 2. Cases and Authorities

Defendant points to no case that supports a supervisor's directive to take down religious items from an employee's desk in a private office. Similarly, a citation of a federal ruling that endorses a do-not-engage-in-religious-conversation order in a private office setting is missing from the defendant's motion. Defendant cites mostly free speech cases of limited relevance. One free exercise case (*Berry v. Dep't of Soc. Servs.*, 447 F.3d 642 (9th Cir. 2006)) supports Plaintiff's claim of clearly established law. *Berry* involved a county government employee who met with members of the public in his office cubicle. Like the Defendant's two orders in this case, in *Berry,* the government restricted Mr. Berry from displaying a Bible in his work cubicle and told him not to discuss religion with members of the public at his cubicle. The Ninth Circuit relied on its earlier free exercise guidance in *Tucker*. *Id*. at 651 ("Our opinion in *Tucker* is instructive.").

For free exercise rights of government employees, both *Tucker* and *Berry* make it clear that there is a divide between those who meet with members of the public and those who do not. In *Berry,* the government prohibited *Berry* from discussing religion with the general public in his government cubicle. In contrast, the court pointed out that

9

1  "[t]he Department does not prohibit Mr. Berry from talking about religion with his

2  colleagues." *Berry*, 447 F.3d at 646.  In *Berry*, the government could direct Mr. Berry to

3  remove a Bible from his cubicle because the public met with Mr. Berry at his workplace

4  cubicle.  The Ninth Circuit explained that the question turned on the public's access to

5  the cubicle and the potential for government endorsement of religion.  *Berry* described

6  the dividing line, "[i]n *Tucker*, the public did not have access to the office areas at issue.

7  Here, the very reason for the Department's restrictions is that clients have access to Mr.

8  Berry's cubicle and might reasonably interpret the presence of visible religious items as

9  government endorsement of religion." *Id*. at 652.  Mr. Berry was not to discuss religion

10 with the members of the public he was serving, but he was free to discuss religion with

11 his colleagues at work.  Here, the Complaint does not allege that Plaintiff met with

12 members of the public at her Marine Corps base office, yet Defendant prohibited her

13 from discussing her faith with colleagues or keeping religious books on her desk.

14         Beyond *Berry*, Defendant cites an *ad hoc* collection of free speech cases and

15 contends those cases do not clearly establish free exercise law. The cases fail to persuade

16 this Court that the free exercise clause remains unsettled.  First, Defendant cites *Perry*

17 *Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37 (1983).  *Perry* is not a free

18 exercise case.  It is a free speech case wherein a plaintiff contended that a public school

19 district's preferential access given to the teachers' union to the internal school mail

20 system violated the First Amendment. *Id*. at 44 ("The primary question presented is

21 whether the First Amendment . . . is violated when a union that has been elected by

22 public school teachers as their exclusive bargaining representative is granted access to

23 certain means of communication, while such access is denied to a rival union.").  Because

24 *Perry* addresses a different issue than the free exercise RFRA claim here, it does not

25 provide helpful authority,

26         Defendant cites the free speech case: *City of San Diego v. Roe,* 543 U.S. 77 (2004).

27 In *Roe*, the City of San Diego terminated a police officer for selling videotapes he made

28 showing himself engaging in sexually explicit acts while in police uniform. *Id*. at 78.

1    The officer challenged his firing on free speech grounds. The Court upheld the firing.

2    *Id.* at 84 ("Applying these principles to the instant case, there is no difficulty concluding

3    that Roe's expression does not qualify as a matter of public concern under any view of

4    the public concern test. He fails the threshold test, and *Pickering* balancing does not

5    come into play."). Because *Roe* involves an extreme set of facts and does not address

6    free exercise, it offers no helpful guidance here.

7    Defendant cites another free speech case, *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th

8    Cir. 2009). Eng was a deputy district attorney investigating government fraud. After his

9    supervisor told the press no fraud existed, Eng told them otherwise, and the office fired

10   him in retaliation. Eng sued his supervisor under §1983, and the supervisor invoked

11   qualified immunity, which the court denied. The Ninth Circuit affirmed. *Id.* at 1076.

12   *Eng* is an entirely different context for a different constitutional claim, which is not

13   helpful here.

14   Defendant cites *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 957 (9th Cir.

15   2011). *Johnson* also involves a free speech claim. The court held that the school hired

16   the calculus teacher for his curricular speech, so he did not enjoy a free speech right to

17   "speak as freely at work in his role as a teacher about his views on God, our Nation's

18   history, or God's role in our Nation's history." *Id.* at 957. It has no application beyond

19   the school context and is not helpful here. *Greisen v. Hanken*, 925 F.3d 1097, 1112 (9th

20   Cir. 2019) ("We have never extended *Kennedy* and *Poway Unified* beyond the school

21   context.").

22   Next Defendant cites two cases that apply the *Pickering* balancing test to

23   additional free speech claims. In *Moran,* a government deputy commissioner criticized

24   her supervising commissioner, who then fired her. Moran alleged his action violated her

25   free speech rights, and the commissioner invoked qualified immunity. *See Moran v. State*

26   *of Wash.*, 147 F.3d 839, 851 (9th Cir. 1998). The case revolved around political

27   machinations which have no bearing on the RFRA case pending before this Court.

28   *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 716 (9th Cir. 2022) is also a school

district case.  The school district acted after a field trip vendor made controversial tweets on his social media account.  "In response to the school district's adverse action, the field trip vendor . . . sued . . . public school officials under 42 U.S.C. §1983 for violating their First Amendment rights."  *Id.*  Neither of these speech cases cast doubt on the clear free-exercise teachings of *Tucker* and *Berry*.  They are not helpful.

Defendant finishes with a citation to *White v. Pauly*, 580 U.S. 73, 74 (2017).  *White* is a police excessive force case.  The Supreme Court said, "[t]his case addresses the situation of an officer who — having arrived late at an ongoing police action and having witnessed shots being fired by one of several individuals in a house surrounded by other officers — shoots and kills an armed occupant of the house without first giving a warning."  It has no bearing on the law applicable to the free exercise of religion in a government office setting.  *White* does address the clearly established law inquiry and says, "it is again necessary to reiterate the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'  As this Court explained decades ago, the clearly established law must be 'particularized' to the facts of the case."  *Id.* at 79.  *Tucker* and *Berry* are Ninth Circuit cases that do just that – erecting guideposts and highlighting the dividing line between public offices and private offices.

If the Ninth Circuit caselaw was not clear enough to clearly establish the applicable free exercise principles, Executive Branch legal guidelines and memoranda for federal employees on the subject of free exercise left little room for believing Defendant's twin directives were permissible.  Twenty years before the period at issue here, the White House issued guidelines on religious exercise in the federal workplace.  *See* Guidelines on Religious Exercise and Religious Expression in the Federal Workplace, August 17, 1997, The White House, Office of the Press Secretary,

https://clintonwhitehouse4.archives.gov/WH/New/html/19970819-3275.html.[4]  Section 1 of the Guidelines advises:

> (1) Expression in Private Work Areas. Employees should be permitted to engage in private religious expression in personal work areas not regularly open to the public to the same extent that they may engage in nonreligious private expression, subject to reasonable content and viewpoint-neutral standards and restrictions: such religious expression must be permitted so long as it does not interfere with the agency's carrying out of its official responsibilities.

> Examples

> (a) An employee may keep a Bible or Koran on her private desk and read it during breaks.

Defendant's alleged directive to Plaintiff to remove a Bible from her desk contradicted this federal guideline.  Section 2 of the Guidelines addresses Defendant's second directive about not speaking about religious topics with co-workers and requires a different approach:

> (2) Expression Among Fellow Employees.  Employees should be permitted to engage in religious expression with fellow employees, to the same extent that they may engage in comparable nonreligious private expression, subject to reasonable and content-neutral standards and restrictions: such expression should not be restricted so long as it does not interfere with workplace efficiency.  Though agencies are entitled to regulate such employee speech based on reasonable predictions of disruption, they should not restrict speech based on merely hypothetical concerns, having little basis in fact, that

---

[4] The President William J. Clinton White House Guidelines have the force of an Executive Order.  *See* Legal Effectiveness of a Presidential Directive, as Compared to an Executive Order, 24 Op. O.L.C. 29 (2000) ("[T]here is no substantive difference in the legal effectiveness of an executive order and a presidential directive that is styled other than as an executive order.").

the speech will have a deleterious effect on workplace efficiency.

Examples

(a) In informal settings, such as cafeterias and hallways, employees are entitled to discuss their religious views with one another, subject only to the same rules of order as apply to other employee expression. If an agency permits unrestricted nonreligious expression of a controversial nature, it must likewise permit equally controversial religious expression.

Those Guidelines remained in effect, and the Attorney General re-emphasized them in October 2017 while Defendant still supervised Plaintiff. *See* Office of the Attorney General, MEMORANDUM FOR ALL EXECUTIVE DEPARTMENTS AND AGENCIES, Federal Law Protections for Religious Liberty, Oct. 6, 2017, Appendix at 10a ("The federal government's approach to free exercise in the federal workplace provides useful guidance on such reasonable accommodations. For example, under the Guidelines issued by President Clinton, the federal government permits a federal employee to 'keep a Bible or Koran on her private desk and read it during breaks'").

Defendant objects that Executive Branch Guidelines should not be considered a proper source of clearly established law. Def's Reply, Dkt. 17, at 6-7. One judge agrees. *See Dixon v. Yellen*, 2024 WL 1831967 *6 (D.D.C. Mar. 21, 2024) ("But these are not proper sources of 'clearly established law.'"). However, *Dixon* rejected a federal employee's RFRA claim that a COVID-19 vaccine mandate and the ending of telework burdened her free exercise. *Dixon* explained that overcoming qualified immunity required caselaw and that there was no caselaw (binding or otherwise) about whether a vaccine mandate or rejecting a telework application violated RFRA. *Id.* Indeed, *Dixon* had already identified many cases rejecting the employee's closely related claim of a hostile work environment (under Title VII). *Id.* at *4 ("Numerous courts have rejected similar claims of hostile work environment based on COVID-19-related workplace

14

23-CV-02021-BEN-DEB

requirements, which in some instances included isolated commentary on an employee's religious beliefs."). The Executive Branch Guidelines from the Clinton administration and the 2017 Attorney General Memorandum both pre-dated and said nothing about the COVID-19 pandemic and its vaccine mandates and teleworking.

This case presents a different context. In this case, the Executive Branch Guidelines used specific examples that describe factual scenarios that are remarkably similar to the alleged office settings and workplace burdens to which Plaintiff complains. Defendant allegedly was an Executive Branch employee working in a human resources office when these Guidelines were in effect. In this context, there is no just reason to disregard Guidelines for all federal employees from the top of the Executive Branch-- Guidelines using examples of similar kinds of religious exercise that are entitled to First Amendment protection in the workplace – in considering whether the law is clearly established.

Finally, *Tucker* is not even an outlier. Before *Tucker*, the *en banc* Eighth Circuit ruled the same way on the same two issues of religious exercise in government employment. *See Brown v. Polk County, Iowa*, 61 F.3d 650 (8th Cir. 1995) (*en banc*). Like Plaintiff in this case, Brown worked in a government office. Brown's supervisor ordered him to cease any activities that "could be considered to be religious proselytizing, witnessing, or counseling while on the job." *Id.* at 658. Brown's supervisor also "directed Mr. Brown to remove from his office all items with a religious connotation, including a Bible in his desk." *Id.* at 653.

As to the first directive, the Eighth Circuit held, "[t]hat order exhibited a hostility to religion that our Constitution simply prohibits." *Id.* at 659. Regarding the second directive, the Eighth Circuit found the order to be "extraordinary" and wrong. The Eighth Circuit noted that even if other employees found Brown's religious displays offensive, the government "could not legally remove them if the reason was the content of their message. *Id.* That is because, the Eighth Circuit explained, the government would then be taking sides in a religious dispute and, in so doing, violate the

1    Establishment Clause or the Equal Protection Clause. *Id.* As to the second directive, the

2    Eighth Circuit remarked, "Mr. Brown also complains about the directive to remove from

3    his office all items with a religious connotation, including a Bible that was in his desk. It

4    is here, perhaps, that the zealotry of [Brown's supervisor] is most clearly revealed." *Id.*

5    **V.      CONCLUSION**

6           The Court decided *Brown* after a five-day trial. During that trial, the government

7    failed to show any work disruption or interference with government operations that could

8    justify the supervisor's directives. *Id.* Perhaps at summary judgment or trial in this Court,

9    Defendant may be able to prove in his defense that his twin directives either did not

10   substantially burden Plaintiff or that they were the least restrictive means of promoting a

11   compelling government interest. Today, Plaintiff pleads a plausible RFRA claim that

12   names a proper defendant and seeks money damages as the appropriate remedy.

13          "The Free Exercise Clause commits government itself to religious tolerance, and

14   upon even slight suspicion that proposals for state intervention stem from animosity to

15   religion or distrust of its practices, all officials must pause to remember their own high

16   duty to the Constitution and to the rights it secures. Those in office must be resolute in

17   resisting importunate demands and must ensure that the sole reasons for imposing the

18   burdens of law and regulation are secular." *Church of Lukumi Babalu Aye, Inc*, 508 U.S.

19   at 547. The motion to dismiss is denied.

20          **IT IS SO ORDERED.**

21          Dated: January 6, 2025

22                                              **HON. ROGER T. BENITEZ**

23                                              United States District Judge

24

25

26

27

28

23-CV-02021-BEN-DEB